# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-01449-COA

**FRANKY LEE LOVERN, SR. A/K/A FRANKY LOVERN**  APPELLANT

**v.**

**STATE OF MISSISSIPPI**  APPELLEE

DATE OF JUDGMENT: 11/06/2024
TRIAL JUDGE: HON. STEVE S. RATCLIFF III
COURT FROM WHICH APPEALED: RANKIN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: JAMES LEE KELLY
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
 BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY: JOHN K. BRAMLETT JR.
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 02/10/2026
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., LAWRENCE AND LASSITTER ST. PÉ, JJ.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1. Franky Lee Lovern Sr. was convicted by a jury in Rankin County of one count of sexual battery and one count of gratification of lust for crimes perpetrated against his grandson R.W. when R.W. was fifteen years old.[1] On appeal, Lovern raises thirteen issues for our review, but none requires reversal. We therefore affirm Lovern's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2. In January 2024, R.W. disclosed to his parents, Roger and Crystal, that Crystal's

---

[1] We use initials to protect the minor's privacy.

father, Lovern, had sexually abused him. Crystal took R.W. to the Rankin County Sheriff's Office, and they met with Investigator Tyler Burnell. Investigator Burnell took R.W.'s statement and viewed text messages between Lovern and Crystal, as well as Facebook messages between Lovern and his wife, Laurinda, all of which Crystal had provided during the interview.

¶3.     In the text messages to Lovern, Crystal confronted him about R.W.'s accusations, and Lovern told her, "Whatever he says I did to him, he did the same to me." She did not recall if Lovern denied the specifics of R.W.'s accusation.

¶4.     In the Facebook messages, Lovern told Laurinda that he was "not going to jail" and that "it was [R.W.'s] fault." Lovern also said he had awoken once to R.W. performing fellatio on him and that he intended to "say something" but did not "know how to or who to say something to." He denied performing oral sex on R.W. or sodomizing him. Lovern also alleged that R.W. "did this to [him] because" Lovern had "put him against the wall and hollered at" R.W.'s sister. Lovern claimed that R.W. had "beat [him] to the draw."

¶5.     Lovern was indicted for two counts of sexual battery and one of count gratification of lust. At trial, Crystal testified that this was not the first time that R.W. had made allegations against Lovern. She said that in 2019, she learned that Lovern exposed R.W. to pornography. She testified that she did not believe at the time that Lovern had intentionally shown R.W. pornographic material. Lovern told her that he had shown R.W. some music videos with "half-dressed women dancing" and that R.W. had likely misunderstood.

2

Although R.W. was fifteen at that time, his cognitive level was closer to that of a ten- or eleven-year-old. Crystal explained that R.W. was born in December 2003 and had been diagnosed with autism spectrum disorder, bipolar disorder, and oppositional defiance disorder at various times. Throughout his teenage years, R.W. was in school and receiving daily treatment at mental healthcare centers.

¶6.     Although Crystal did not believe that R.W.'s exposure to pornography was intentional, she took him to the Children's Safe Center in October 2019, where he met with a pediatric sexual assault nurse examiner, Regan Doleac, who performed a forensic exam on R.W. Doleac testified at trial that her extensive exam showed no physical sign of sexual abuse and was "normal." She read from her report: "[R.W.] has not disclosed a history that includes maltreatment to date. His physical exam today was normal, which neither confirms nor denies previous maltreatment. It is important to remember that many forms of sexual contact do not leave physical evidence. In comparing his physical findings to available history, no inconsistencies were noted." Doleac testified that she performed a full exam on R.W. despite there being no allegation of physical abuse at that time. She explained that protocol required a full exam for any type of suspected sexual maltreatment because many times an exam leads to an undisclosed issue. Doleac's report showed Crystal reported that she did not believe Lovern had any "ill intention" and believed that Lovern had shown R.W. music videos, not actual pornography.

¶7.     After R.W.'s report, law enforcement secured an arrest warrant for Lovern and

brought him in for an interview. Investigator Chris Cousin interviewed Lovern after he waived his *Miranda*[2] rights. The interview was recorded and played for the jury at trial. In the interview, Lovern denied that he had ever touched R.W. inappropriately. He suggested to the officers that R.W. was making it up to "get back at" Crystal for her divorce from Roger, R.W.'s father. Lovern told the officers that nothing sexual had ever happened with R.W., but when officers confronted him with the Facebook message he had sent to Laurinda, in which he claimed that he woke one night to R.W. performing fellatio on him, Lovern admitted that. Lovern told the officers he yelled at R.W. to get out, and he told them that Laurinda had slept through the whole thing.

¶8.    At trial, R.W. testified that the first sexual incident with Lovern was when Lovern showed him pornography magazines and videos from a pornography website on Lovern's phone. They were in the workshop behind Lovern's house, which R.W. testified had cameras and a monitor showing if anyone was approaching the building from the outside.

¶9.    R.W. admitted that he liked seeing the pornography at first because his hormones were becoming more active now that he was around fifteen years old. Sometimes after showing R.W. pornography, Lovern would pull his penis out for R.W. to look at. R.W. would then pull his out, and Lovern would comment on its size. One day during the summer when R.W. was fifteen, Lovern asked him about his ejaculate. Lovern asked if R.W. wanted to taste the ejaculate because it would taste good. R.W. agreed and allowed Lovern to masturbate into

---

   [2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

his mouth. R.W. said only the tip of Lovern's penis touched his mouth.

¶10.    Later, this activity progressed to Lovern penetrating R.W.'s mouth with his penis. R.W. testified that he was "very uncomfortable," and he stopped going to Lovern's for a while. R.W. was still fifteen when this happened. Eventually, Lovern offered R.W. money to perform oral sex, but R.W. testified that he never received any money. R.W. would perform oral sex on Lovern, and Lovern would reciprocate.

¶11.    Once, R.W. asked to help clean the shop so he could earn some money, but Lovern would not let him clean. Lovern did offer money in exchange for oral sex. Lovern asked R.W. to go into the bedroom, which he did. When R.W. got on the bed, Lovern climbed into the bed and began masturbating himself before performing oral sex on R.W. R.W. also performed oral sex on Lovern. R.W. said he was very uncomfortable, but he wanted to get it over with because he wanted some money. Lovern also asked R.W. if he had ever had anal sex, and R.W. said no and that he did not want to. But R.W. testified that Lovern sodomized him anyway.

¶12.    R.W. testified that he did not tell anyone about this for "the longest" time because he was ashamed of himself. He also still loved his grandfather even though he "knew everything was wrong there." He did not tell Doleac either because he did not want any of it to become public. He eventually told his dad because his dad had always been there for him. On cross-examination, R.W. admitted that he had visited Lovern's attorney's office before trial and sworn by affidavit that he wanted to drop the charges against Lovern. But R.W. explained

5

that he had done so only at his dad's urging, and Roger admitted during his testimony that he had encouraged R.W. to drop the charges because he was afraid Lovern would try to harm himself in order to avoid trial. The State rested after R.W.'s testimony.

¶13. Savannah Adcock testified as a character witness that R.W. did not have a reputation for truth and veracity. She knew him from their time together as voluntary fire department members, but she admitted she had only known him since 2020 or 2021.

¶14. Pam Keaton, Lovern's niece, testified she visited Lovern's home many times and had seen the shop behind the house. She testified that the doors were usually open and that people were always going in and out of the shop. She did not see R.W. there often. She said he did not have a good reputation for telling the truth.

¶15. Betty Yates, Lovern's sister, testified that she often visited Lovern's house and that the shop behind it had a large bay door that was always open. She said that people were "in and out" of the shop due to Lovern's work as a mechanic. She did not believe there would have been an opportunity for Lovern to molest R.W. in the shop. On cross, Yates testified that R.W. was "known for lies," and she also said that he did not have a reputation for truthfulness.

¶16. Franky Lovern Jr. ("Franky") testified that the doors of Lovern's shop were always open and that there were "always" people coming and going from the shop. Franky said that he had seen R.W. there, too, because he (Franky) was there most days as well.

¶17. Laurinda testified that she was a housewife and was at home most of the time. She

said if Lovern was in the shop, she was there every two to three minutes to check on him. She could see directly into the shop from her kitchen window. She said that R.W. was not there much at all. She did not believe that Lovern had any opportunity to assault R.W. in the shop. R.W. never acted like anything was wrong between him and Lovern. Laurinda claimed that she woke up one night to Lovern yelling at R.W. to get out of the room, but she had not realized that R.W. had been performing oral sex on Lovern. She did not mention this to anyone because she did not think it was important, and Lovern did not tell her about the oral sex.

¶18.    Lovern testified in his defense and denied R.W.'s accusations. He was asked about a statement in his text message to Crystal, which said, "Whatever he says I did to him, he did the same to me." Lovern said that he remembered that text because he hit a dip in the road while typing it and accidentally sent it before finishing his thought. He said that he sent a message afterward that said "which was nothing," meaning that Lovern had done nothing to R.W. and that R.W. had done nothing to him.

¶19.    However, Lovern admitted that he was awoken one night by R.W. performing fellatio on him. He testified that one night he and Laurinda were asleep in their bed, and he awoke to R.W. climbing into the bed, grabbing his penis, and putting it in his (R.W.'s) mouth. Lovern said when he realized it was R.W. and not Laurinda, he kicked at R.W. and told him to get out. He testified that he was not wearing pants and usually slept nude or in boxers. Lovern said R.W. was between fifteen and seventeen then. At that time, he and Laurinda

7

shared a full-sized bed.

¶20. Lovern said he was "terribly ashamed and shocked" after this encounter and did not know what to do. A few weeks after the incident, Lovern told R.W. to tell his parents about it or else Lovern would have to tell someone. After that conversation, R.W. made the sexual assault allegations. Lovern claimed that was what he meant by "he beat me to the draw" in the message to Laurinda. Lovern believed that R.W. was making false allegations in order to cover his own behavior.

¶21. Following deliberations, the jury found Lovern guilty of one count of sexual battery (Count I) and one count of gratification of lust (Count III). The jury acquitted Lovern of a second count of sexual battery, which related to R.W.'s allegation of anal sex. The Rankin County Circuit Court sentenced Lovern to serve thirty years for Count I and a concurrent term of fifteen years for Count III to serve in the custody of the Mississippi Department of Corrections. Lovern filed post-trial motions seeking a judgment notwithstanding the verdict or a new trial, which were denied. He appealed.

## ANALYSIS

¶22. Lovern raises thirteen issues for our review, but none require reversal. We address each argument in turn and affirm Lovern's convictions and sentences.

### I. Sufficiency of the Evidence

¶23. Lovern argues that the State presented insufficient evidence to support his convictions on Counts I and III. Specifically, he claims that the State's investigators ignored evidence,

that R.W.'s various behavioral or medical conditions rendered him untrustworthy, and that R.W.'s testimony was not corroborated by any other evidence.

¶24. "When a defendant challenges the sufficiency of evidence against him, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Different v. State*, 179 So. 3d 1078, 1081 (¶12) (Miss. 2015). "If the evidence points in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty," we will reverse and render. *Id.* (quotation marks omitted). "However, if reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense, the evidence will be deemed to have been sufficient." *Id.* (quotation mark omitted).

¶25. We have repeatedly held that "the unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where the testimony is not discredited or contradicted by other credible evidence." *E.g.*, *Walker v. State*, 343 So. 3d 1089, 1093 (¶12) (Miss. Ct. App. 2022) (collecting cases). We have similarly rejected arguments that there must be physical evidence of sexual assault to corroborate the victim's claims. *Id.*

¶26. To present sufficient evidence of sexual assault, Count I, the State had to show that Lovern engaged in sexual penetration, specifically fellatio, with R.W. at a time when R.W. was between fourteen and sixteen years old and when Lovern was more than thirty-six

9

months older than R.W. *See* Miss. Code Ann. §§ 97-3-95(1)(c), 97-3-97(a) (Rev. 2020). To present sufficient evidence of gratification of lust, Count III, the State had to show that Lovern handled, touched, or rubbed his hands or part of his body on R.W. while R.W. was younger than sixteen for the purposes of gratifying Lovern's lust or depraved licentious sexual desires. *See* Miss. Code Ann. § 97-5-23(1) (Rev. 2020).

¶27.    The State presented sufficient evidence for reasonable jurors to have found the essential elements of both sexual assault and gratification of lust beyond a reasonable doubt. As to Count I, R.W. testified that when he was fifteen, Lovern encouraged him to perform oral sex on Lovern, who was in his fifties, and R.W. admitted that he had done so. R.W. testified that this occurred mostly in the shop behind Lovern's house and at least once in Lovern's bedroom.

¶28.    As to Count III, R.W. testified that when he was fifteen, Lovern asked him if he wanted to taste ejaculate, and then Lovern proceeded to masturbate into R.W.'s mouth. R.W. testified that on this occasion, Lovern's penis touched but did not penetrate his mouth.

¶29.    R.W.'s testimony was sufficient to support the jury's verdicts on Counts I and III. Neither physical evidence nor corroboration of R.W.'s testimony by another witness was required to support the jury's verdicts.

## II.    Weight of the Evidence

¶30.    Lovern raises similar arguments regarding R.W.'s credibility and claims that the convictions were against the overwhelming weight of the evidence. "When this Court

reviews a challenge to the weight of the evidence, the verdict will be overturned when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Different*, 179 So. 3d at 1081-82 (¶15). We have repeatedly held that "it is in the province of the jury to determine the credibility of witnesses." *Walker*, 343 So. 3d at 1093 (¶12).

¶31. At trial, Lovern's counsel repeatedly referenced his concerns with R.W.'s credibility and highlighted discrepancies in R.W.'s testimony. The jury heard testimony from Lovern's character witnesses, who each testified that R.W. had a poor reputation for truthfulness. The jury also heard testimony that Lovern was rarely ever alone at his shop, that Laurinda could see into the shop from the home, and that Lovern's penis did not match R.W.'s description. Despite this, the jury found R.W.'s testimony regarding Counts I and III to be credible. We note that the jury acquitted Lovern of Count II, suggesting that they appropriately weighed the conflicting testimony before reaching their verdicts.

¶32. Lovern's guilty verdicts were not against the weight of the evidence, and he is not entitled to a new trial on that ground.

### III. Evidence of R.W.'s Sexual Behavior

¶33. Lovern argues that the trial court erred by restricting his ability to provide evidence of R.W.'s "prior aberrant behavioral issues," including evidence of "sexual impulsivity" issues and possible sexual preferences.[3] The State argued that the evidence was inadmissible

---

[3] Lovern sought to introduce evidence from R.W.'s forensic interview that he had

11

under Mississippi Rule of Evidence 412, which prohibits evidence of a victim's prior sexual behavior, and the trial court excluded the evidence on that basis. On appeal, Lovern argues that the exclusion of this evidence prohibited him from presenting a complete defense, suggesting that he would have argued to the jury that R.W.'s "bizarre behavior" led him to "fantasize [about] a homosexual relationship with his grandfather."

¶34. The trial court's denial of a motion in limine regarding Rule 412 evidence is reviewed for an abuse of discretion. *Galloway v. State*, 122 So. 3d 614, 668 (¶177) (Miss. 2013). "The purpose of Rule 412 is 'to prevent the introduction of irrelevant evidence of the victim's past sexual behavior to confuse and inflame the jury into trying the victim rather than the defendant.'" *Id.* (quoting *Hughes v. State*, 735 So. 2d 238, 273 (¶153) (Miss. 1999)). Rule 412 prohibits evidence of specific instances of a victim's past sexual behavior unless offered to prove someone else was the perpetrator, to prove consent, or unless "constitutionally required to be admitted." MRE 412. Here, Lovern suggests the evidence was "constitutionally required" so he could form a defense.

¶35. However, as the State points out, the evidence had no connection to Lovern's conduct and no rational support for Lovern's argument that R.W.'s "bizarre behavior" suggested that he was fabricating his allegations. The trial court weighed Lovern's proffer on the necessity of the evidence and the State's response, correctly applied Rule 412, and did not abuse its

---

found "a soiled diaper from someone else, pull[ed] it out of a garbage can, . . . put[] it on and then later masturbat[ed] into that soiled diaper."

discretion in excluding the evidence.

## IV.    Jury Instruction S-6

¶36.    Lovern argues that the trial court erred by giving the State's jury instruction that referred to the testimony of "a sex-crime victim," arguing that the language invades the jury's province to determine whether R.W. truly was a victim and "leaves to the jury only the issue of whether the defendant is the one who did the abusing." Instruction S-6 read: "The Court instructs the Jury that the uncorroborated testimony of a sex-crime victim is sufficient to support a conviction if accepted as true by the finder of fact."

¶37.    We review the grant or denial of jury instructions for an abuse of discretion. *Pitts v. State*, 291 So. 3d 751, 755 (¶17) (Miss. 2020). "If the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Id.*

¶38.    At the outset, we note that S-6 is an accurate statement of the law. *Id.* at 757-58 (¶34); *see also Walker*, 343 So. 3d at 1093 (¶12). More to the point, the Supreme Court and this Court have approved earlier use of this exact language and have rejected the argument that it is peremptory or an improper comment on the evidence. *See Pitts*, 291 So. 3d at 757-58 (¶¶32-36); *Morris v. State*, 319 So. 3d 504, 507 (¶9) (Miss. Ct. App. 2021); *Parks v. State*, 228 So. 3d 853, 871 (¶¶70-71) (Miss. Ct. App. 2017). The same result follows here because S-6 does not tell the jury how to weigh the credibility of the victim's testimony, only that "if [the testimony is] accepted as true by the finder of fact," the jury may "accept or reject it." *Pitts*, 291 So. 3d at 758 (¶36). The trial court did not abuse its discretion in giving instruction

S-6.

### V. Admission of Lovern's Prior Bad Acts

¶39. Lovern argues that the trial court erred by allowing the State to admit evidence of un-indicted bad acts by Lovern. He points to the State's opening statement, which referenced "masturbating with [Lovern]," "having oral sex multiple times with [Lovern]," and having "anal sex with [Lovern]"; and the State's closing argument, which said that Lovern "sexually abused this child repeatedly multiple times." Lovern also notes that R.W. testified that "oral sex started happening" when he was fifteen.

¶40. Rule 404(b) of the Mississippi Rules of Evidence generally prohibits the admission of evidence if that evidence is intended to prove the defendant's character and to show he acted in accordance with that character. MRE 404(b)(1). However, that evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). If offered for an admissible purpose, the evidence must still pass through the "ultimate filter" of Rule 403. *McCammon v. State*, 299 So. 3d 873, 892 (¶70) (Miss. Ct. App. 2020); MRE 403. Under Rule 403, evidence must be excluded if its probative value is "substantially outweighed" by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or cumulative evidence. MRE 403.

¶41. In cases involving sexual abuse, "evidence of prior sexual acts between the accused and the victim is admissible to show the accused's lustful, lascivious disposition toward the

14

particular victim, especially in circumstances where the victim is under the age of consent." *Walker v. State*, 878 So. 2d 913, 915 (¶14) (Miss. 2004).

¶42. R.W. testified that when he was fifteen, Lovern showed him pornography and then exposed his penis, and that Lovern's predation only grew from that point. R.W. testified that Lovern talked to him about ejaculate and encouraged him to taste it, eventually masturbating into R.W.'s mouth. R.W. also testified that Lovern made him perform oral sex both in the shop behind Lovern's house and in Lovern's home. R.W. consistently testified that he was fifteen when these assaults occurred.

¶43. Lovern argues on appeal that he could not have defended against all acts "spanning an unquantified period of time when he was charged with a mere three counts," but R.W.'s testimony was contained to events that took place when he was fifteen and occurred only in the shop and the bedroom. Lovern even admitted to receiving oral sex from R.W. in his bedroom, though he claimed that R.W. had initiated the act without provocation. As discussed, these other acts were admissible under Rule 404(b) to show Lovern's lustful and lascivious disposition toward R.W.

¶44. Lovern also argues that the State did not limit its reason for using the other acts and instead asserted all the exceptions of Rule 404(b). However, the trial court expressly found that the other acts were relevant because they were acts between Lovern and R.W., stating: "This court would deem [the evidence] not only relevant but more probative than prejudicial and would be allowed between the defendant and the victim." The fact that the State failed

to articulate a specific exception does not mean the trial court abused its discretion in admitting the evidence, particularly where the trial court found it to be relevant under Supreme Court caselaw and performed a Rule 403 balancing test before allowing its admission.

## VI. References to R.W. as a "Victim"

¶45. Lovern argues that the trial court erred by denying his motion in limine to preclude the State from referring to R.W. as a victim. Lovern claims that the State's references to R.W. as a victim rather than the "alleged victim," which "presumed that a crime had occurred when that issue was very much a fact issue for the jury."

¶46. We have previously rejected a similar argument. In *Groves v. State*, 360 So. 3d 1012 (Miss. Ct. App. 2023), we found no error in a trial court's denial of the defendant's motion in limine to bar the word "victim," noting, "While we agree that judges sit in an influential position over the jury, it is also true that trial judges are in the best position to determine what is prejudicial to a jury and how to address those concerns." *Id.* at 1017 (¶14). In *Groves*, we reasoned that the trial court had adequately addressed similar concerns by "admonish[ing] the jury . . . on the presumption of innocence, burden of proof, and importance to weigh the evidence from the witness stand." *Id.* at 1018 (¶14). The trial court here also appropriately instructed the jury on the presumption of innocence, the State's burden, and the jury's duty to weigh the evidence. We find no error.

## VII. Jury Instruction D-3

16

¶47. Lovern argues the trial court erred by refusing instruction D-3, which read:

> This Court instructs the jury that you are bound in deliberating upon this case, to give the defendant the benefit of any reasonable doubt of the defendant's guilt that arises out of the evidence or want of evidence in this case. There is always a reasonable doubt of the defendant's guilt when the evidence simply makes it probable that the defendant is guilty. Mere probability of guilt will never warrant you to convict the defendant. It is only when, after examining the evidence on the whole, you are able to say on your oaths, beyond a reasonable doubt, that the defendant is guilty that the law will permit you to find him guilty. You might be able to say that you believe him to be guilty and yet, if you are not able to say on your oaths, beyond a reasonable doubt, that he is guilty, it is your sworn duty to find the defendant, Franky Lee Lovern, Sr, "Not Guilty."

¶48. Lovern argues that the trial court's instruction on the presumption of innocence, which the trial court gave instead of D-3, "never [gave] the jury any inkling of what quantum of evidence is measured by the term 'reasonable doubt.'" Lovern argues that D-3 was a correct statement of law and "was more helpful" to the jury's understanding of reasonable doubt.

¶49. As noted, we review the refusal of jury instructions for an abuse of discretion. *Pitts*, 291 So. 3d at 755 (¶17). "If the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Id.*

¶50. This precise instruction has been rejected as "an improper attempt to define 'reasonable doubt.'" *Thompson v. State*, 230 So. 3d 1044, 1052 (¶26) (Miss. Ct. App. 2017) (quoting *Fulgham v. State*, 46 So. 3d 315, 332 (¶15) (Miss. 2010)). We likewise find no abuse of discretion in refusing instruction D-3.

### VIII. Statements During Voir Dire

¶51. Lovern argues the trial court abused its discretion by preventing him from asking the

17

venire if they were aware of the local news story about the "Goon Squad," a group of white law enforcement officers who later pleaded guilty to various state and federal charges.[4] He claims that questioning potential jurors about their awareness of the Goon Squad would be more effective than asking directly if they would consider a law enforcement witness's testimony more credible than a non-law enforcement officer.

¶52. "In general, voir dire is presumed sufficient to ensure a fair and impartial jury. To overcome the presumption, a party must present evidence indicating that the jury was not fair and was partial and must show that[,] that prejudice resulted from the circuit court's handling of voir dire." *Keller v. State*, 138 So. 3d 817, 843 (¶47) (Miss. 2014). We review the trial court's management of voir dire for an abuse of discretion. *Id.*; *see also Pitchford v. State*, 45 So. 3d 216, 229 (¶43) (Miss. 2010) ("Voir dire of a jury is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion."). As Lovern acknowledges in his brief, "an abuse of discretion will only be found where a defendant shows clear prejudice resulting from undue lack of constraint on the prosecution or undue constraint of the defense."

¶53. During voir dire, Lovern's counsel asked, "Is there anyone here who has not heard of the 'Goon Squad?'" The State asked to approach the trial court, and a bench conference followed. The trial court told Lovern's counsel to "be careful" because "none of that has

---

[4] *6 Ex-Officers Plead Guilty to Civil Rights Charges in Assault on 2 Black Men in Mississippi*, The New York Times (Aug. 3, 2023), https://www.nytimes.com/2023/08/03/us/mississippi-officers-charged-civil-rights.html.

been volunteered at all." Counsel responded, "I think I'm entitled to know if people keep up with the news." The trial court stated, "Well you can ask them that. Nobody in [the Goon Squad] was involved in this case. That doesn't need to be an issue on this."

¶54. On appeal, Lovern makes no convincing argument that the trial court's admonishment resulted in "clear prejudice" to the jury's impartiality. He was allowed to and did ask the potential jurors whether they would give a law enforcement witness more weight and credibility "just because he's a law enforcement officer." He has shown no prejudice, and we find no abuse of discretion.

## IX. Objections During Closing Argument

¶55. Lovern argues that the trial court erred by limiting his references to the "tyranny" of government during his closing argument because the "theme" of the closing remarks was "the paucity of evidence" proving Lovern's guilt.

¶56. We review a trial court's rulings related to closing arguments for an abuse of discretion and must determine whether prejudice resulted from that ruling. *See Jones v. State*, 962 So. 2d 1263, 1275 (¶45) (Miss. 2007). Generally, counsel is afforded "wide latitude of discussion" during closing arguments. *Brewer v. State*, 704 So. 2d 70, 73 (¶91) (Miss. 1997) (quoting *Clemons v. State*, 320 So. 2d 368, 371-72 (Miss. 1975)). "Counsel may draw upon literature, history, science, religion and philosophy for material for his argument. He may navigate all rivers of modern literature or sail the seas of ancient learning; he may explore all the shores of thoughts and experiences. The trial court should be very careful in limiting

19

free play of ideas, imagery, and personalities of counsel in their argument to [the] jury." *Id.* (citations and quotation marks omitted).

¶57. Here, Lovern's attorney said:

> Are the good citizens of Rankin County going to return a verdict of guilt based upon that kind of investigation, that kind of loosely put together type of a case where only one witness has to say something, where only one witness has to say it happened and you're gone? No, I don't believe that. I don't believe that you or any of us here want to live in a community where the constitution is basically ignored, where we're living in fear of tyranny from the government. . . .

The State objected, and at a bench conference, the trial court warned counsel to "be careful with that" and to "make the final arguments on the case" that were "not so inflammatory." He told counsel to "move on," and arguments resumed.

¶58. Nothing in the trial court's admonishment resulted in prejudice to Lovern. Lovern complains that the trial court limited his argument regarding the "paucity of evidence," but counsel argued that point before and after the State's objection. At no point did the trial judge direct the jury to disregard counsel's remarks; he merely told counsel to move on. As there was no prejudice to Lovern, there was no abuse of discretion.

### X. Lovern's Cell Phone

¶59. Lovern argues that he was denied the ability to examine physical evidence in the State's possession—his own cell phone that was seized by the State after his arrest. Lovern argues that the refusal to allow him to physically access the phone prevented him from accessing allegedly exculpatory text messages.

20

¶60. In *Chisholm v. State*, 365 So. 3d 229 (Miss. 2023), the Supreme Court handled a similar issue. Chisholm argued that the State committed a violation by not presenting exculpatory evidence on his phone, alleging that the phone records would have shown text messages favorable to his case but failing to present "specifics of what the messages would have revealed." *Id.* at 242 (¶52). The Supreme Court held this was "simply not enough" to show "that the prosecution suppressed favorable evidence." *Id.* The *Chisholm* court also noted that Chisholm made "no mention of any efforts on his part to obtain the records—not even those of his own cell phone. And the State is not required to seek out and discover 'all possible exculpatory evidence for a defendant.'" *Id.* at 242-43(¶53) (emphasis omitted) (quoting *Montgomery v. State*, 891 So. 2d 179, 183 (Miss. 2004)).

¶61. Here, the record shows that Lovern had multiple opportunities to review the "phone dump" the State conducted on the phone and was offered the chance to view the phone well in advance of trial. At trial, Lovern argued that he should be allowed to view the phone, turn it on, and look for a text message allegedly missing from the State's full extraction of the phone. The State argued that they had provided Lovern with the full extraction of the phone and that Lovern's counsel had refused to tell the State what text message was allegedly missing and had refused all help to comb through the extraction.

¶62. The trial court heard arguments from both sides and from IT experts before denying Lovern's request to take possession of the phone. The trial court noted that both IT experts admitted that Lovern's phone could be erased remotely if it was powered on, and the trial

21

court believed that the full extraction done by the State was sufficient to provide Lovern with access to the evidence.

¶63. On appeal, Lovern presents no authority to support his argument that the trial court's ruling was in error, and given Lovern's ample opportunity before and during trial to look for the text message, we find no error.

### XI. Limiting Defense Witnesses

¶64. Lovern argues the trial court erred by "arbitrarily" limiting him to only two witnesses who could speak to R.W.'s reputation for veracity. As the State neared the end of its case-in-chief, the trial court asked Lovern how many witnesses he anticipated calling during the defense's case, and Lovern said he had between six and eight witnesses. Lovern explained that they were character witnesses who would testify to R.W.'s reputation for truth and veracity. The trial judge said, "Let's don't have a bunch of character witnesses. . . . We don't need six or eight of them. A couple of them will do. I mean, that gets a little bit redundant if it's the same thing over and over and over." The next day, the trial court again told Lovern that he would not allow more than two character witnesses. During Lovern's third witness, when counsel began to ask about R.W.'s reputation, the trial court interjected and said once again that he would not allow too many character witnesses. The trial court allowed Lovern to finish questioning that witness about R.W.'s reputation for truthfulness.

¶65. Rule 608 of the Mississippi Rules of Evidence provides that "a witness's credibility may be attacked . . . by testimony about the witness's reputation for having a character for

. . . untruthfulness." MRE 608(a). Like all witness testimony, Rule 608 is subject to Rule 611, which gives the trial court "reasonable control" over the examination of witnesses and specifically allow the court to exercise that control in order to "avoid wasting time." MRE 611. We review the trial court's limitation on witnesses or witness testimony for an abuse of discretion. *Davis v. State*, 351 So. 3d 978, 980 (¶11) (Miss. Ct. App. 2022). An abuse of discretion "will only be found where a defendant shows clear prejudice resulting" from the trial court's decision. *Cf. Vasser v. State*, 317 So. 3d 990, 997 (¶22) (Miss. Ct. App. 2021) (reviewing the trial court's limitation on questioning during voir dire).

¶66. Lovern has shown no clear prejudice from the trial court's restriction on character witnesses. Rule 611 gives the trial court the power to limit questioning to avoid repetition and redundancy, and the trial judge warned Lovern on at least three occasions that he would not permit Lovern to call all eight of his desired character witnesses. Plus, following the trial court's final warning about redundant character evidence, the court allowed Lovern to continue questioning the witness on the stand about R.W.'s reputation for truth and veracity. Lovern has shown no support for his argument that the limitation on witnesses resulted in prejudice to his case, and we find no abuse of discretion.

## XII. Inconsistent Verdicts

¶67. Lovern argues that the jury's verdicts were inconsistent because the jury acquitted him of one charge and convicted him of the other two, and he argues that this requires reversal. He points to no authority that would require us to reverse; indeed, he acknowledges that "an

inconsistent verdict, in and of itself, is insufficient to reverse a conviction."

¶68. On this point, Lovern is correct. This Court and the Mississippi Supreme Court have routinely held that "inconsistent verdicts are permissible and are not a ground for reversal." *Brown v. State*, 336 So. 3d 134, 142 (¶23) (Miss. Ct. App. 2020) (quoting *Culp v. State*, 933 So. 2d 264, 280 (¶51) (Miss. 2005)). This holds true for Lovern's convictions as well.

### XIII. Cumulative Error

¶69. Lovern argues that we should reverse his convictions under the cumulative error doctrine, which "holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Whittaker v. State*, 269 So. 3d 1226, 1229 (¶9) (Miss. Ct. App. 2018). However, where we find no error, there can be no cumulative error. *Id.* at 1230 (¶14). As we have found no error here, we likewise find no due process violation pursuant to the cumulative error doctrine.

### CONCLUSION

¶70. After a review of the issues raised, arguments made, and the record of the case, we find no error and affirm Lovern's convictions and sentences.

¶71. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND WEDDLE, JJ., CONCUR. EMFINGER, J., NOT PARTICIPATING.**